Lawrence Lee BROWN, a/k/a, Lawrence Lee Thomas, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–93–007–CR.

Court of Appeals of Texas, Corpus Christi.

Aug. 11, 1994.

William C. Hodge, Rosalind Kelly, Houston, for appellant.

George J. Filley, III, Dist. Atty. of Victoria County, Keith S. Weiser, Victoria, for state.

Before KENNEDY, GILBERTO HINOJOSA, and YAÑEZ, JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

An indictment charged that appellant, Lawrence Lee Brown a/k/a Lawrence Lee Thomas, intentionally and knowingly entered a habitation, by intruding his body into the habitation, without the effective consent of C.F., the owner, and therein attempted to commit and committed the felony offense of sexual assault. A jury found him guilty of the offense of burglary of a habitation as alleged in the indictment and assessed punishment at life in prison. By three points of error, appellant attacks the sufficiency of the evidence to support his conviction, and he complains that the trial court abused its discretion in admitting DNA profiles into evidence and that he received ineffective assistance of trial counsel. We affirm.

On September 18, 1991, C.F., was in her kitchen when she heard a noise. She turned off the lights and went to her bedroom to investigate. She did not see anything and came back. She turned on the light and saw someone standing in the middle of the hall. She could see his face and asked him how he got into her house. He grabbed her and put his hands on her face, knocking off her glasses. He took her to the bedroom, and while she was on the bed, he got on top of her and put his hands on her neck area. He removed her shorts and underwear and placed his penis into her vagina. She testified that she did not give him consent to enter her home or to have sex with her.

During the trial-in-chief, C.F. described her attacker as a black man and kind of young with short hair. The State's attorney asked her:

State: Were you able to see him—Did you see his face at all very closely?

C.F.: Yes. When I turned on the light.

\* \* \* \* \* \*

State: Now, earlier when you testified, you pointed over at the defendant. Let me ask you this. Do you recognize the defendant as the man that attacked you or do you just think that's the man that attacked you?

C.F.: No, I can say that that is him. (Indicating)

State: Is there anything about him that stands out in your mind that that's why you recognize him?

C.F.: Because of his face—

State: Okay.

C.F.: —that I saw. When I turned on the light, yeah.

Other evidence showed that the alleged crime occurred on or about September 18, 1991, and that the attacker entered her home through a window.

Officer Williams looked for evidence at C.F.'s house. A window to her home had a tear on its lower portion which was where the latch was that locked the screen to the window. Police removed a latent fingerprint off of the window's glass. Based upon that print, Williams got a warrant for appellant and went to a residence where appellant was allegedly staying. He found him hiding in the garage's attic. After the arrest, Williams procured appellant's saliva and blood samples. Williams testified that a doctor's examination of C.F. provided her vaginal swabs as evidence. Other evidence included C.F.'s shorts, blouse, panties, and hand towel. Police sent the swabs, appellant's blood and saliva samples, and C.F.'s clothing and towel for analyses.

Roxana Lecocke, a DPS forensic scientist, identified two seminal stains on the front of C.F.'s shirt, and she detected seminal fluids on C.F.'s panties and on the towel. Her tests showed that the semen-donor blood type was blood-type B. She tested for phosphoglucomutase (PGM) in the semen stains and determined that there were three possible types for the semen donor out of a possible ten. These PGM types were $1 + 2 +$, $1 - 2 +$, or $2 +$. She tested appellant's blood and saliva and found that he was a B se-

cretor which matched the B part of the semen. His PGM type was $1 + 2 +$, one of the three possible PGM types for the semen donor. She testified that approximately four percent of the black population (based on a national study) was a B secretor and PGM $1 + 2 +$. Her tests could not exclude appellant as a suspect in this case.

Dr. Harold Deadman testified that he worked at the FBI laboratory's DNA Analysis Unit. His job was to analyze items containing biological stains. He analyzed the semen stains on the towel and obtained DNA profiles for four probes that were used to make a comparison. On one of those probes, the DNA matched the DNA profiles from appellant's known blood sample for three probes. The fourth probe was inconclusive but did not exclude appellant as a contributor of that DNA. Dr. Deadman also testified that the FBI used data bases to allow it to calculate the frequency of the particular result in the general population. He said that the FBI's best estimate was that approximately 1 in 200,000 persons had DNA in the black population like that generated in this case. He stated that the frequency in the Caucasian data base was approximately one in three million and that the frequency in the Hispanic data base was approximately one in one million. In his opinion, these test results were consistent with an extremely strong or powerful association between appellant and the alleged crime. He further stated that this was not an absolute identification, but the likelihood of it coming from someone else was very small.

Glenn Unnasch, a DPS latent-print examiner, testified that the latent print found on C.F.'s window and the known print of appellant's left ring finger were made by the same person.

Appellant's counsel did not call any witnesses. On cross-examination, counsel showed that Officer Williams took C.F.'s statement. Williams stated on cross that she did not get a good look at appellant, because she was not wearing her glasses. He also elicited from Williams that the fingerprint on the window did not mean that appellant was in the house and that even though the print

was recent, Williams could not determine what day it was made. On cross-examination of Lecocke, counsel stressed to the jury that four percent of the black population had appellant's blood type and PGM type. On cross-examination of Dr. Deadman, counsel homed in on the make up of the FBI's black data base. Dr. Deadman testified that the FBI's data base consisted of approximately 500 persons. Counsel also stressed through Dr. Deadman that the DNA match in this case was not an absolute match. His cross-examination of Glenn Unnasch showed that the fingerprint from C.F.'s window was a partial print with 12 comparison points and that the United States's courts, unlike some other countries, did not have an established minimum amount of characteristics for fingerprint comparison.

By point two, appellant attacks the sufficiency of the evidence to support his conviction for burglary of a habitation. He complains that the State did not meet its burden to prove all of the elements of the offense beyond a reasonable doubt.

In reviewing the sufficiency of the evidence, we must determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Butler v. State,* 769 S.W.2d 234, 239 (Tex. Crim.App.1989). We must take each case and review all the evidence to determine whether the State has proven beyond a reasonable doubt every element of the alleged crime and not just a plausible explanation of the crime. *Butler,* 769 S.W.2d at 239. The appellate court must look to the charge to determine whether the evidence is sufficient to support the conviction. *Arceneaux v. State,* 803 S.W.2d 267, 271 (Tex.Crim.App. 1990). In this case, the charge authorized conviction as follows:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 18th day of September, A.D.1991, in Victoria County, Texas, the ... [appellant] did then and there intentionally or knowingly enter a habitation, by intruding his body into said habitation, without the effective consent of [C.F.], the owner, and

therein attempted to commit or committed the felony offense of SEXUAL ASSAULT, then you will find ... [appellant] guilty as alleged in the indictment....

Section 30.02(a)(1) of the Texas Penal Code provides in pertinent part that "(a) A person commits an offense if, without the effective consent of the owner, he: (1) enters a habitation ... with intent to commit a felony or theft...." Tex.Penal Code Ann. § 30.-02(a)(1) (Vernon 1989). Section 30.02(b)(1) states that "'enter' means to intrude: (1) any part of the body...." Tex.Penal Code Ann. § 30.02(b)(1) (Vernon 1989). Section 22.-011(a)(1)(A) of the Texas Penal Code provides that "(a) A person commits an offense if the person: (1) intentionally or knowingly: (A) causes the penetration of the ... female sexual organ of another person by any means, without that person's consent." Tex.Penal Code Ann. § 22.011(a)(1)(A) (Vernon Supp.1994). Section 22.011(b)(1) provides that "(b) A sexual assault under Subsection (a)(1) of this section is without the consent of the other person if: (1) the actor compels the other person to submit or participate by the use of physical force or violence." Tex.Penal Code Ann. § 22.011(b)(1) (Vernon Supp.1994).

The State's evidence showed that C.F. recognized appellant as the man that allegedly attacked her and that he used physical force to hold her down in order to have sexual relations with her. She did not consent to the sex act or to him entering her house. The fingerprint found on C.F.'s window compared with appellant's ring finger. The DPS's semen-stain tests showed that approximately four percent of the black population was a B secretor and PGM 1 + 2 + which fit appellant's profile. The FBI's DNA test results were consistent with an extremely strong or powerful association between appellant and the alleged crime. Even though the defense attempted to cast doubt on and disputed some of this evidence, viewing the evidence in the light most favorable to the verdict as we must, we hold that a rational trier of fact could have found beyond a reasonable doubt that at the time alleged, appellant entered C.F.'s home and sexually

assaulted her and that C.F. did not consent to this conduct. We overrule point two.

■ By point three, appellant complains that the trial court abused its discretion by admitting the DNA profiles into evidence without determining that this evidence was reliable. Appellant's contention is that the trial court did not allow him to have a hearing outside the presence of the jury to determine the reliability of the DNA evidence. Therefore, it abused its discretion. In *Kelly v. State*,[1] the Court of Criminal Appeals reviewed the admissibility of DNA evidence.[2] The *Kelly* case concerned a technique used to compare DNA from the accused's blood with DNA from a semen stain found at the home of the accused's victim. The Court stated that evidence derived from a scientific theory, in order for a court to consider it reliable, must satisfy three criteria in any particular case: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly*, 824 S.W.2d at 573. The Court further stated:

> Under Rule 104(a) and (c) and Rule 702, *all three criteria must be proven to the trial court*, outside the presence of the jury, before the evidence may be admitted. Factors that could affect a trial court's determination of reliability include, *but are not limited to*, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique

can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly*, 824 S.W.2d at 573 (emphasis in original). Under rule 702, the proponent of novel scientific evidence must prove to the trial court, by clear and convincing evidence and outside the jury's presence, that the proffered evidence is relevant. If the trial court is so persuaded, then it should admit the evidence for the jury's consideration, unless the trial court determines that some factor identified in rule 403[3] outweighs the probative value of the evidence. *Kelly*, 824 S.W.2d at 573.

■ The State called only one witness, Dr. Deadman, to establish the reliability of its DNA testing in this case. Dr. Deadman testified that he had a Ph.D. and that his major field was organic chemistry. He joined the FBI in 1970 and spent about 15 and one-half years working in the FBI's laboratory conducting hair, fiber, and textile examinations. In 1987, he was re-assigned to a research group that was studying the use of DNA for conducting laboratory comparisons. In March 1989, he was assigned as a supervisor in the FBI laboratory's DNA Analysis Unit. His training in forensic-DNA analysis began in 1987 and included lectures, molecular-biology courses (a field that was part of forensic-DNA analysis), course work at the FBI academy, and numerous seminars and workshops. Since 1989, he had examined evidence in over 700 cases. His entire time was devoted to some aspect of DNA analysis, either actual examination or the teaching of forensic-DNA analysis.

He said that a person's DNA was unique throughout their lifetime, and, with few exceptions, it did not change. He explained that forensic-DNA analysis involved the extraction of DNA from a biological stain

---

1. 824 S.W.2d 568 (Tex.Crim.App.1992).

2. DNA (deoxyribonucleic acid) is an "organic chemical of complex molecular structure that is found in all living cells and that codes genetic information for the transmission of inherited traits." 4 Encyclopedia Britannica 140 (1990).

3. Rule 403 of the Texas Rules of Criminal Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex.R.Crim.Evid. 403.

(blood or semen) and then processing the DNA so that forensic scientists can compare DNA from an unknown source with DNA from a particular person. If the DNA matched, the FBI used a statistical analysis to determine how often the results occurred in a particular population group. Dr. Deadman explained the step-by-step analysis which the FBI used to make a DNA comparison and said that the scientific community had used this process for 20 years as a general scientific method for analyzing and studying DNA for a number of different purposes. He further stated that the scientific community had used this process for about seven years to conduct forensic-DNA analysis and that it was an acceptable, valid process which produced results.

Dr. Deadman testified about the quality-assurance program in the DNA Analysis Unit which ensured that the FBI received reliable, valid results. Numerous controls were built into the process that would almost always inform the laboratory when something went wrong. If a mistake was made, the chances were likely that the laboratory would catch it. When a match was made, another examiner reviewed the case to verify the results. The DNA Analysis Unit's manager made a final review before a correct result was released. He stated that the FBI laboratory properly applied the technique in this case.

Dr. Deadman explained that the FBI used data bases to calculate the frequencies of forensic-DNA-analysis results in the general population. It selected persons along ethnic-racial lines and analyzed their DNA. It had data bases for blacks, whites, American Indians, and Hispanics. According to Dr. Deadman, the FBI's sample bases consisted of between 500 and 700 persons which was considered more than enough to generate reliable frequencies.

We conclude that the State showed by clear and convincing evidence that the scientific principle underlying the FBI's technique was valid, that the technique itself was valid, that the technique was properly applied in this case, and that the related population-frequency studies were also valid and reliable. Moreover, nothing suggested that one of the rule 403 factors outweighed the probative value of the DNA evidence.

### Did the Trial Court's Failure to Hold a Hearing Amount to Reversible Error?

■ *Kelly* states that the three criteria *"must be proven to the trial court,* outside the presence of the jury, before the evidence may be admitted." *Kelly,* 824 S.W.2d at 573 (emphasis in original). In the instant case, the State did not establish the *Kelly* criteria outside the jury's presence. Thus, the trial court erred by failing to have a hearing on this issue. However, we hold that the error was harmless under these circumstances. We believe that the reasoning behind the hearing is to keep a jury from being tainted in the event that the proponent of the novel scientific evidence cannot prove its reliability. In this case, the State satisfied the *Kelly* criteria. Remanding the case for a new trial so that the trial court can hold a hearing on this issue, which the State has already established, would amount to a waste of judicial time. We overrule point three.

■ By point one, appellant complains that he was denied the effective assistance of trial counsel guaranteed under article 1, section 10 of the Texas Constitution and the Sixth and Fourteenth amendments to the U.S. Constitution.[4] The proper standard for determining ineffective-assistance claims under the Sixth Amendment is the standard adopted by the U.S. Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104

---

4. In *Jackson v. State,* 877 S.W.2d 768, 772 (Tex. Crim.App.1994), a case concerning an accused's claim of ineffective assistance of trial counsel, Judge Baird stated in his concurrence that:

> "This case [*Jackson v. State* ] stands for a very simple proposition: As a general rule, one should *not* raise an issue of ineffective assistance of counsel on direct appeal. [footnote omitted] This is so because a trial record is

generally insufficient to address claims of ineffective assistance of counsel in light of the 'strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance.'" (citing *Strickland v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 2055, 80 L.Ed.2d 674 (1984)).

*Jackson,* 877 S.W.2d at 772.

S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court of Criminal Appeals adopted this standard in *Hernandez v. State*[5] and restated it in *Jackson v. State,* 877 S.W.2d 768, 770–71 (Tex.Crim.App.1994). In *Strickland,* the Supreme Court adopted a two-pronged analysis for ineffective-assistance claims. Under the first prong, the accused must show that counsel's performance was deficient, to the extent that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Under the second prong, the accused must show that counsel's deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Under the *Strickland* test, the accused has the burden to prove ineffective assistance. *Jackson v. State,* 877 S.W.2d at 771. In addition, when reviewing a claim of ineffective assistance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■ Appellant attacks the effectiveness of his trial counsel on seven grounds.

**1. Trial counsel did not properly exercise peremptory challenges and allowed a biased juror to serve on the panel.**

During *voir dire* examination, this exchange occurred between appellant's trial counsel and veniremember Ley:

Counsel: Ms. Ley, what was the question you had?

Ms. Ley: Well, I just had my home burglarized less than two months ago and I've had a hard time dealing with that.

Counsel: Well, that is a good question. If any of you have been a recent victim of crime—He was asking you about your feelings towards policemen. Maybe you feel bad, not about the guy that did it, but the way that the police handled it.

In your particular case, it was a burglary in your home?

Ms. Ley: Uh-huh.

Counsel: And you feel like you might be operating under that bias or prejudice?

Ms. Ley: Yes, sir. In all fairness.

Counsel did not strike veniremember Ley, and she was seated on the jury panel.

This problem was similar to that discussed in *Jackson.* In that case, a jury found the accused guilty of three robberies. During *voir dire,* the trial court asked the venire if any of them were robbery victims. One venire member stated that he was a robbery victim. (Upon elaboration, the facts showed that he was a burglary victim.) It then asked this venire member, "[W]ould the fact of having an assailant in your home while you were asleep, is that going to impact on your impartiality in this trial?" He stated that "it probably would." The accused's counsel did not challenge him for cause and did not use a peremptory challenge against him. This venire member was seated on the jury.

The Court of Criminal Appeals noted that the first prong of *Strickland* was not met due to the lack of evidence in the record concerning trial counsel's reasons for not challenging or striking that venire member. The Court was unable to conclude that the accused's trial counsel's performance was deficient.

■ Like the situation in *Jackson,* the record in this case does not show why trial counsel did not challenge venire member Ley. Thus, the first prong of *Strickland* was not met in the instant case. Due to the lack of evidence in the record concerning trial counsel's reasons for not challenging or striking venire member Ley, we are unable to conclude that trial counsel's performance was deficient. Following *Strickland,* we must presume that counsel is better positioned than us to judge the pragmatism of the par-

5. 726 S.W.2d 53 (Tex.Crim.App.1986).

ticular case, and that he "made all significant decisions in the exercise of reasonable professional judgment." *Delrio v. State,* 840 S.W.2d 443, 447 (Tex.Crim.App.1992).[6]

**2. Trial counsel did not call exculpatory witnesses.**

■■■ Appellant argues that trial counsel did not let him present alibi evidence during the trial-in-chief and that trial counsel did not let him present character evidence at his punishment hearing.

The trial court held a hearing on appellant's motion for new trial.[7] At the hearing, appellant's mother, Ora Lee Hosey, testified that on the date of the alleged crime, she and appellant lived together. She said that appellant's trial counsel did not interview her prior to trial. She asked trial counsel to allow her to testify, but he did not call her as a witness. She also asked trial counsel if he would let other persons testify, but he did not let them testify. According to her, these witnesses knew of appellant's whereabouts at the time of the alleged crime. She said that trial counsel did not interview those witnesses. Appellant's trial counsel did not testify at the hearing.

The record in this case does not show why trial counsel did not call any witnesses during the trial-in-chief. Due to the lack of evidence in the record concerning this issue, we are unable to conclude that his performance was deficient.

After the State rested at the punishment hearing, appellant's trial counsel and appellant had the following exchange in open court outside the jury's presence:

Counsel: Mr. Lawrence [appellant], would you address the Court? Is that true or not true, that we've been talking about it at this point of the trial, about putting

on any evidence, and we've decided that's not what we are going to do?

Appellant: Your Honor, we'll leave it like it is. I'll address my attorney and leave it like it is.

Appellant did not call any witnesses at the punishment hearing.

In this instance, appellant appears to have agreed with trial counsel's decision not to call witnesses at the punishment hearing. The record is silent about why trial counsel decided not to call any witnesses at the punishment hearing. Therefore, we are unable to conclude that his performance was deficient in this instance.

**3. Trial counsel did not fully investigate the case.**

■■■ The record does not show to what extent counsel did or did not investigate this case. Since the record is silent on this issue, we are unable to conclude that trial counsel's performance was deficient.

**4. Trial counsel did not object to the court's charge on punishment or ask for a probation instruction.**

Appellant filed a pre-trial application for a probated sentence. The punishment charge did not include a probation instruction, and trial counsel did not object to the charge. The record is silent about trial counsel's reasons for not requesting a probation instruction. Due to the lack of evidence in the record on this issue, we are unable to conclude that trial counsel's performance was deficient.

■■■ **5. & 6. Trial counsel did not file a motion to suppress appellant's arrest and did not challenge the probable cause to get appellant's blood and saliva sam-**

---

**6.** In *Delrio,* the Court of Criminal Appeals held that a trial counsel's failure to challenge a venire member who had voiced his lack of impartiality did not constitute ineffective assistance under *Strickland.* The venire member, Johnny Martinez, informed the trial court that he was an ex-narcotics' officer, and that he knew the accused, who was on trial for a drug offense, from his work as a narcotics' officer. Martinez also informed the trial court that he could not serve impartially in the accused's trial. Counsel, however, did not challenge him for cause and did not

use a peremptory challenge against him. Noting that the record was silent about the reasons for counsel's decision not to challenge Martinez, and citing the strong presumption in *Strickland* against a finding of ineffective assistance, the Court determined the record insufficient to overcome that presumption.

**7.** Appellant's trial counsel did not represent him on the motion for new trial.

**ples.** Appellant has not brought forth a sufficient record to show whether counsel's alleged failure to challenge the arrest or search would have had any chance of success. Due to the lack of evidence on this issue, we are unable to conclude that trial counsel's performance was deficient.

■ **7. Trial counsel did not file a motion to suppress the DNA evidence on the basis of its reliability or prejudicial effect to appellant.** We have already held that the DNA evidence was reliable and that it did not prejudicial appellant. We are unable to conclude that trial counsel's failure to file a motion to suppress the DNA evidence showed that his performance was deficient. We overrule the point of error.

We hold that appellant was not denied effective assistance of trial counsel.

We AFFIRM the trial court's judgment.