Elias Anthony FRANCO, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–98–00008–CR.

Court of Appeals of Texas,
El Paso.

Feb. 17, 2000.

Discretionary Review Refused
Aug. 30, 2000.

Allen R. Stroder, Hirsch & Stroder, L.L.P., Odessa, for Appellant.

John W. Smith, Dist. Atty., J. Roderick Price, Deputy Dist. Atty., Odessa, for State.

## *O P I N I O N*

DAVID WELLINGTON CHEW, Justice.

This is an appeal of a conviction for the offense of murder. A jury found Appellant guilty and assessed punishment at 99 years in the Institutional Division of the Texas Department of Criminal Justice. Franco raises seven points of error. We affirm the conviction.

In January 1997, Myrtice and Chester Derrick left Odessa, Texas for the weekend leaving their adult son, Carl, home alone. Mrs. Derrick returned home Sunday evening. She found the kitchen in disarray. The dining table and chairs were overturned. She found her son, Carl, lying on the floor in a pool of blood. Unable to rouse him, she tried to call 911, but the phones in the kitchen and bedroom had been ripped from the walls. She ran to her neighbor's house and he called the police.

Carl had been severely beaten with a cast iron skillet and stabbed seven or more times. The skillet hit with such force that the handle was broken off. Both of Carl's eye sockets were broken, his nose was broken, and there were many contusions and lacerations to his face. The backs of Carl's hands were also covered with bruises, abrasions, and lacerations. Four of the stab wounds could cause death: (1) one to the side of Carl's head which penetrated his skull and caused swelling and hemorrhaging of the brain; (2) one to the side of his face and upper neck that severed his jugular vein; (3) a stab wound in his chest that penetrated his heart; and (4) another wound to the chest that perforated Carl's small intestine.

Carl's pickup truck was noticed missing and a short time later, police found Byron Johnson driving the missing pickup. Johnson allegedly told the police that he had "rented" the pickup truck from Franco for twenty dollars and that Franco was staying at a "crack house" on the south side of Odessa. Johnson led the police to the house where Franco was staying.

Police found Franco in the house asleep on a couch. After being awakened, Franco agreed to go with the officers to the police station for questioning. Franco asked the officers to retrieve his shoes, leather jacket, and shirt. A detective picked up the clothing, and saw that various articles were blood-stained.

At the police station, Franco made a statement which was tape recorded. Franco said that Carl picked him up on the Andrews Highway and offered him a ride that Saturday night. They drove to Carl's home and went inside. Inside, Carl asked Franco to come to his bedroom where he attempted to take Franco's jeans off, rip-

ping them in the process. Franco said that struggle began and moved from the bedroom, down the hall, and into the kitchen. Franco, who is 5'6" tall and weighing 130 pounds, insisted that he was defending himself against Carl, who was about 6' tall and weighed around 200 pounds. When they entered the kitchen, Franco said he grabbed a frying pan and hit Carl in the head. Franco admitted that the handle broke off the pan when he hit Carl. Then Franco picked up a knife and stabbed Carl. Franco said that he stabbed Carl "everywhere because he kept comin' at me." Franco also stated that he kicked Carl in the head, and kept kicking Carl because he tried to get up. Franco did not leave the house until Carl stopped moving. When he left, Franco took Carl's wallet and pick up truck. Throughout his statement, Franco maintained that he only acted in self-defense. Franco stated that he was not injured in any way during the altercation.

In his appeal, Franco raises seven points of error for our consideration; the first point was resolved earlier in this proceeding and only six remain to be addressed here. In his second and third points of error, Franco asserts that the trial court abused its discretion when it allowed Detective Robertson to testify that Franco was found in a "crack house" and that Franco had needle marks on his arms at the time of his apprehension. Franco argues (1) that the trial court erred by not conducting a balancing test under Rule 403 of the Rules of Evidence, (2) that this evidence was more prejudicial than probative, and (3) that the evidence was inadmissible evidence of an extraneous offense, namely the use of illicit drugs.

The trial court is not required to articulate its mental balancing of the probative and prejudicial effects of the evidence. As we have stated, "[a] trial court is not ... required to conduct a separate hearing on the matter or even to announce on the record that it is mentally balancing ..." the probative value and prejudicial

effect of the evidence. *Menchaca v. State*, 901 S.W.2d 640, 648 (Tex.App.—El Paso 1995, pet. ref'd). Moreover, the record clearly shows that the trial court conducted the proper balancing test during a conference outside the presence of the jury at the behest of the prosecutor in apparent compliance with Franco's motion in limine, and immediately prior to the challenged testimony. We find no support for this element of Franco's complaint.

Insofar as the probativeness versus the prejudicial value of the detective's statements, the evidence does have some probative value. Franco's sole defense was that he assaulted Carl to fend off an aggressive sexual attack. The evidence that Franco was found in a "crack house," and that needle marks were present on Franco's arms, when coupled with the fact that Franco took Carl's wallet and pick up truck rebuts Franco's defense by providing a motive. A rational inference can be drawn that Franco killed Carl during the course of a robbery to obtain money and property to purchase illicit drugs. Such evidence is admissible as proof of motive, even if we consider it to be evidence of unadjudicated extraneous offenses. *See Williams v. State*, 927 S.W.2d 752, 757 (Tex.App.—El Paso 1996, pet. ref'd), *quoting Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Crim.App.1991)(op. on reh'g).

Whether the probative value of the evidence is outweighed by unfair prejudice inherent in the detective's statement that "[Byron Johnson] could just tell us that it was a crack house over on Bunche, is where the last time [Johnson] saw [Franco]" is a closer call.

The statement is certainly prejudicial. We are troubled by the fact that the trial court, before finally overruling Franco's objection, asked the State: "I assume that Byron Johnson is going to testify?" The State said yes and he did testify, but he never testified that the house in question was a "crack house." However, it is clear from the record the "crack house" state-

ment was neither unanticipated nor a surprise to Franco. Consequently, though we view the admission of the statement with considerable disfavor, we cannot say that the trial court abused its "very substantial discretion in balancing probative value on the one hand and unfair prejudice on the other...." *See Menchaca v. State,* 901 S.W.2d 640, 649 (Tex.App.—El Paso 1995, pet. ref'd), *quoting Montgomery v. State,* 810 S.W.2d 372, 379 (Tex.Crim.App.1990). Accordingly, we overrule Points of Error Two and Three.

■ In his fourth and fifth points, Franco argues that the trial court erred when it admitted expert testimony, over objection, concerning blood spatter analysis without either conducting a hearing outside the presence of the jury or requiring the State to show by clear and convincing evidence that the blood spatter evidence was relevant and reliable under the standards announced in *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992). The State concedes that the trial court erred. The State argues that the error is harmless and points out that blood spatter evidence has been admissible as scientific evidence since 1987.

■ The "threshold determination" for a trial court to make regarding the admission of expert testimony is whether that testimony will help the trier of fact understand the evidence or determine a fact in issue. *Kelly,* 824 S.W.2d at 572; *Duckett v. State,* 797 S.W.2d 906, 910 (Tex.Crim. App.1990). Thus, the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. Indeed, we understand Franco's substantive complaint to be that the evidence was not reliable or relevant and, further, controverted Franco's claim that Carl was the aggressor because the expert, Police Officer Pippins "painted a scenario of that [Franco] was the aggressor, and the movement of the deceased and [Franco] during the fray was away from the exit rather than toward the exit...."

■ To find that scientific evidence is reliable, it must be shown that the evidence has as its basis "sound scientific methodology." *Forte v. State,* 935 S.W.2d 172, 176 (Tex.App.—Fort Worth 1996, pet. ref'd). This assessment of reliability forces the trial courts to "weed out" testimony pertaining to "junk science," or otherwise inadequately tested scientific theories. *Forte,* 935 S.W.2d at 176. To do so, the testimony must meet the proper tests for scientific reliability, and the testimony must reflect information outside the general knowledge of lay persons. *See Schutz v. State,* 957 S.W.2d 52, 70 (Tex.Crim.App. 1997).

We can envision circumstances where the trier of fact may be quite properly aided by some evidence of blood splatter analysis, but we are dubious of the claim in this record that blood spatter evidence can "determine the aftermath of a violent incident of bloodshed and to try to determine the location of individuals before, during and after bloodshed and to try to determine, perhaps, a sequence of events that occurred based upon the bloodstain evidence available at the scene." Such evidence, the testimony of a police officer potentially qualified to testify as an expert on blood splatter, would likely carry exceptional weight and an aura of reliability which could lead the jury to conclusions based upon more on speculation than scientific explanation. Moreover, whatever its degree of reliability and relevance, the focus is very narrow and limited. *See generally Ex parte Mowbray,* 943 S.W.2d 461, 462 (Tex.Crim.App.1996).

Even if blood spatter pattern analysis is scientifically valid, it may be unhelpful for some other reason. The evidence may be unhelpful, even though reliable, if its probative value is substantially outweighed by, e.g., the risk of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or the presentation of cumulative evidence. *See Emerson v. State,* 880 S.W.2d 759, 763 (Tex.Crim.App.1994);

see also TEX.R.CRIM.EVID. 403. In this case, a substantial part of the officer's testimony as an expert was intended to contradict Franco's self-defense. In particular, the officer's opinion that there was "no evidence to show that [Carl] was ever an aggressor in any way," is well wide of the possibly permissible focus of such evidence. While the statement is literally true, it is dangerously misleading. We find nothing in the blood spatter analysis from which any "expert" could draw an opinion as to who was (or who was not) the initial aggressor, an opinion repeatedly made and emphasized in this case.

█ We review this error according to Texas Rule of Appellate Procedure 44.2(b) because an error in the admission of evidence affects a substantial right. TEX. R.CRIM.EVID. 103(a); Garza v. State, 963 S.W.2d 926 (Tex.App.—San Antonio 1998, no pet.). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. Upon a finding that a substantial right has been violated, we have adopted the analysis laid out by the San Antonio Court of Appeals:

> [W]e conclude that we will apply rule 44.2(b) to an error in the admission of evidence by first asking: what substantial rights of the defendant are implicated by the admission of the erroneous evidence? Then, for each right implicated by the error, we will ask: did the error affect the jury's verdict? To answer this question, we will consider: (1) the source of the error, (2) the nature of the error, (3) whether or to what extent it was emphasized by the State, (4) the probable collateral consequences of the error, (5) how much weight jurors probably placed on the error, and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. If after considering these factors, the answer to the question is 'no,' we will deem the error harmless and conclude that the substantial rights of the defendant were not affected. If the

answer to the question is 'yes,' we will consider the same factors to determine the extent the error affected the jury's verdict. If the error only slightly affected the verdict, we will deem the error harmless. But if the error affected the jury's verdict more than slightly, we will conclude that the substantial rights of the defendant were adversely affected. With this result, we will deem the error harmful, and reverse and remand.

Garza, 963 S.W.2d at 930.

In this case, the State introduced the evidence and it was obviously the source of the error. Officer Pippins testified as an unqualified expert and his testimony went well beyond a limited description of the injuries suffered and their location with respect to other physical evidence to an unfounded declaration that there was no evidence that the victim had initiated the events. This error was emphasized by the State during the officer's questioning and mentioned at least once during the State's closing arguments. The probable collateral consequences of the error is to place an improper limitation on the right of self-defense. See Ramirez v. State, 873 S.W.2d 757 (Tex.App.—El Paso 1994, pet. ref'd). We do note, however, that a self-defense instruction was given to the jury in this case and they rejected that issue.

While it is impossible to say with certainty, the officer's testimony would likely have been given considerable weight by the jurors. However, whatever weight that they might have given his testimony, it is abundantly clear from the record, that the jury did not need an expert's opinion to draw their own conclusions and reject Franco's self-defense claim. The documentary evidence—the photographs of the blood spattered walls and ceiling of the kitchen and the victim's wounds—rebuts the self defensive claim with self-evident clarity. Plus, when coupled with the facts that: Franco took Carl's wallet, and that the physical evidence strongly suggests that as Carl lay dead or dying, he was rolled over and his wallet was ripped from

his pants; that Franco took Carl's pickup; and that the phones in the house were ripped from the wall, the jury could have completely discounted Officer Pippin's testimony and still rejected Franco's self-defense claim.

The State has conceded the error, and that concession weighs favorably in finding that the State would not be encouraged to repeat the error if we hold the error harmless. We do, however, express the caveat that the error here is not simply failing to qualify the witness as an expert, it is the unreliability and misleading nature of the unqualified expert's testimony.

While we conclude that the substantial rights of the defendant were affected, we find that the error did not affect the verdict and that the substantial rights of the defendant were not adversely affected. Accordingly, we overrule Points of Error Four and Five.

■ In his sixth and seventh points of error, Franco argues that the trial court erred by (1) admitting Franco's clothing as evidence because the clothing was seized pursuant to an unlawful arrest, and (2) limiting defense counsel's cross-examinations concerning whether Franco was arrested prior to the seizure of the clothes. According to the testimony of the police officers and the recorded statement of Franco, Franco was not placed under arrest at the time the clothing was seized. Rather the evidence shows that the owners of the house gave the police permission to enter and that Franco agreed to accompany the officer to the station for questioning. Further, even Franco's recorded statement evidenced that it was Franco who asked the police officers to retrieve his clothes, which were still covered in blood. Thus, the police obtained Franco's clothes not only with his consent but at his request. Only at the suppression hearing did Franco assert either that he thought he was under arrest at the house where he was found or that he did not give the police officers consent to take his clothes.

■ We find Franco's sixth and seventh points of error lack merit. If believed, the testimony of the officers was clear, and uncontroverted that the homeowner voluntarily consented to the officers' entry. We will not revisit the trial court's determination that the homeowner gave the officers consent as this finding was based solely on the credibility and weight of the witnesses' testimony. *See Jones v. State,* 944 S.W.2d 642, 650 (Tex.Crim.App.1996), *cert. denied,* 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). We will, however, address whether the consent given by the homeowner was effective against Franco. In Texas, a person with common authority over property may consent to a search of the property. *See United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50 (1974); *Patrick v. State,* 906 S.W.2d 481, 490 (Tex.Crim.App. 1995), *cert. denied,* 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996). "Common authority" is the mutual use of the property by persons generally having joint access or control for most purposes. *Patrick,* 906 S.W.2d at 490, *citing Illinois v. Rodriguez,* 497 U.S. 177, 179, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148, 156 (1990). It has been said that "any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7; *see also Powers v. State,* 459 S.W.2d 847, 849 (Tex.Crim.App.1970)(where two persons have equal rights to the use or occupancy of the premises, either may consent to a search, and the evidence thus disclosed can be used against either). Neither Franco nor the State disputes that the homeowner had common authority over the house where Franco was found. We find that the consent given by the homeowner was effective against Franco and thus Franco's clothing was legally seized pursuant to a consensual search. *See United States v. Morning,* 64 F.3d 531, 536–37 (9th Cir.1995), *cert. denied,*

516 U.S. 1152, 116 S.Ct. 1030, 134 L.Ed.2d 108 (1996)(consent of one cotenant effective against both tenants even where other cotenant objects); *see also Willis v. State*, 518 S.W.2d 247, 249 (Tex.Crim.App.1975) (evidence obtained in apartment jointly occupied by defendant and girlfriend not subject to suppression where girlfriend consented to search). Franco's arguments that the clothes were improperly admitted because they were seized pursuant to an unlawful arrest is without merit. We overrule Franco's sixth and seventh issues on appeal.

Having overruled all of Franco's remaining issues on appeal, we affirm the judgment of the trial court.

McCLURE, Justice, concurring.

While I concur that the trial court's failure to conduct a *Kelly* hearing was harmless error, I find myself in disagreement with the majority's discussion of Points of Error Four and Five. Accordingly, I write separately to express the reasons for my disagreement.

### *The State's Alleged Concession of Error*

I initially question whether the majority has correctly construed the State's concession of error made in response to these points of error. In Point of Error Four, Appellant contends that the trial court erred by allowing expert testimony without first conducting a *Kelly* hearing outside the presence of the jury. In Point of Error Five, he argues that the trial court erred in allowing expert blood spatter testimony without proof that the testimony is relevant and reliable under standards established in *Kelly*. The State concedes, and I agree, that the trial court erred in failing to conduct a *Kelly* hearing outside of the presence of the jury. The State maintains, however, that the failure to conduct the hearing is harmless under Tex. R.App.P. 44.2(b) because the expert witness explained the principles of blood spat-

ter analysis and testified regarding his proper application of these principles to the crime scene. In other words, the witness established *in the presence of the jury* that the expert testimony is relevant and reliable for purposes of Tex.R.Crim.Evid. 702 and *Kelly*. While the State conceded error with respect to the fourth point of error, its argument may not be fairly read as a concession of error with regard to the fifth point. Accordingly, I believe we must conduct an independent analysis of the latter issue.

### *Rule 702, Kelly, Jordan, and Daubert*

Rule 702 of the Texas Rules of Criminal Evidence, which governs the admission of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Tex.R.Crim.Evid. 702.[1]

In *Kelly*, the Court of Criminal Appeals established the threshold requirements for admissibility of expert testimony under Rule 702. *See Kelly*, 824 S.W.2d at 572–73. A trial court's task under Rule 702 is to determine whether the proffered scientific expert testimony is " 'sufficiently reliable and relevant to help the jury in reaching accurate results.' " *Jordan v. State*, 928 S.W.2d 550, 553 (Tex.Crim.App.1996); *Kelly*, 824 S.W.2d at 572. In order to meet that reliability standard, the evidence must meet three criteria: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. *Kelly* listed several non-exclusive factors that

---

1. This case was tried prior to the effective date of the Texas Rules of Evidence. Consequently, all references to the various rules of evidence are to the former Texas Rules of Criminal Evidence unless noted otherwise.

could affect a trial court's determination of reliability.[2] Relying on Tex.R.Crim.Evid. 104(a) and (c) and Rule 702, *Kelly* further required that prior to the receipt of expert testimony into evidence, the proponent must satisfy the trial court by clear and convincing evidence in a preliminary hearing outside the presence of the jury that the evidence meets all three criteria. *Id.* at 573. If the trial court is so persuaded, then the evidence should be admitted for the jury's consideration, unless the trial court determines that the probative value of the evidence is outweighed by some factor identified in Rule 403. *Id.* The standard adopted in *Kelly* applies to all scientific evidence offered under Rule 702. *Hartman v. State,* 946 S.W.2d 60, 63 (Tex. Crim.App.1997).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993), the United States Supreme Court set forth a two-pronged reliability and relevance standard virtually identical to the *Kelly* standard. *Hartman,* 946 S.W.2d at 62; *Jordan,* 928 S.W.2d at 554. While Rule 702 involves the dual inquiry of relevance and reliability, the Supreme Court emphasized that the "overarching subject" of Rule 702 is the scientific validity of the evidence at issue. *Jordan,* 928 S.W.2d at 554–55, *citing Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2797. The Supreme Court explained "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796. The Texas Supreme Court followed suit in *E.I. du Pont de Nemours & Co., Inc. v. Robin-son,* 923 S.W.2d 549 (Tex.1995), adopting the tests enunciated in *Kelly* and *Daubert. Hartman,* 946 S.W.2d at 62.

The focus of the courts in *Kelly, Daubert,* and *Robinson* was on assessing the scientific reliability of the evidence at issue rather than its relevance. *Jordan,* 928 S.W.2d at 555. Because reliability depends upon whether the evidence has its basis in sound scientific methodology, this demands a certain technical showing. *Id.* Accordingly, it is upon the reliability inquiry that trial courts can weed out testimony pertaining to so-called "junk science." *Id.* In sorting the untested or invalid theories from those that are grounded in "good science," trial judges are called upon to serve as "gatekeepers." *Daubert,* 509 U.S. at 595–99, 113 S.Ct. at 2798–99; *see Jordan,* 928 S.W.2d at 555.

### Bloodstain Pattern Analysis

With no analysis of Sgt. Pippins' testimony or of relevant case law from this jurisdiction or others, or of treatises and published materials on a remarkably well-established forensic science, the majority summarily questions the entire basis of bloodstain pattern analysis evidence and dismisses it out-of-hand, suggesting that it is neither reliable nor relevant. Since I rely, in part, on Sgt. Pippins' testimony to establish the validity of bloodstain pattern analysis, and because his qualifications as an expert in this field are important to the reliability determination, I begin by addressing his qualifications. In 1991, he attended a basic bloodstain pattern analysis school in San Francisco, California, followed in that same year by an advanced bloodstain pattern analysis and crime scene reconstruction school in Orlando,

---

2. Those non-exclusive factors are: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Jordan,* 928 S.W.2d at 554 n. 6; *Kelly,* 824 S.W.2d at 573.

Florida. He is a full member of the International Association of Bloodstain Pattern Analysts (IABPA). Sgt. Pippins reviews the IABPA's quarterly newsletter as well as other pertinent literature, including books written by recognized authorities in the field. Further, as part of a 40–hour bloodstain pattern analysis course which Sgt. Pippins teaches to other police officers, he has written a manual on the subject. In addition to this case, he has qualified as an expert witness on bloodstain pattern analysis on two other occasions in the district courts of Ector County.[3]

### Validity of the Underlying Scientific Theory

What is bloodstain pattern analysis? Sgt. Pippins defined it as the study of blood and motion after a violent incident of bloodshed. Because blood is a liquid, it acts in predictable fashion when force or pressure is exerted upon it. Through analysis of the patterns caused by cast off staining, blood transfer, impact spatter, including medium-velocity and high-velocity impact spatter, as well as splashed blood and projected blood, an expert may be able to reconstruct the crime scene, including the relative positions of the bodies during the course of the assault. Despite the majority's skepticism, Sgt. Pippins' definition comports with that given by a number of other experts and associations of experts in the field. According to the IABPA:

> When liquid blood is acted upon by physical forces, bloodstains and bloodstain patterns may be deposited on various surfaces, including the clothing of the individuals present at the crime scene. These bloodstain patterns can yield valuable information concerning the events which led to their creation when examined by a qualified analyst. The information gained can then be used for the reconstruction of the incident

and the evaluation of the statements of the witnesses and the crime participants.[4]

### Validity of the Technique Applying the Theory

The notion that bloodstain pattern analysis may be used in precisely the fashion described by Sgt. Pippins and other experts in the field has been judicially recognized. In a recent American Law Report article discussing the admissibility of "blood splatter" evidence, the author provided the following description of blood splatter interpretation:

> [I]ncludes the process of examining blood that has struck a surface, and applying knowledge regarding the characteristics of blood and the shapes or patterns made by its impact, in order to determine matters such as the direction, angle, and speed of its flight prior to impact, and, ultimately, to assist in reconstructing events occurring in connection with an alleged crime.

> . . .

> Expert testimony regarding the analysis and interpretation of "blood splatters" examined during criminal investigations may be a valuable part of the evidence used by prosecutors, and at times defense attorneys, to reconstruct the events occurring at the time of the alleged crime. By considering facts such as the shape or pattern made by the blood upon impact, the location of the blood splatters, and the mathematical correlation between the length and width of the splatters, experts have been able to make a variety of determinations relating to the reconstruction of crimes by applying general principles of physics, chemistry, biology, and mathematics. Frequently, blood splatter interpretation

---

**3.** In fact, Sgt. Pippins has previously qualified on two occasions as an expert witness in bloodstain pattern analysis before the same trial judge.

**4.** This definition is taken from IABPA's web-page found at "www.bloodspatter.com."

has been used to establish the location of the victim or the attacker during a homicide. Blood splatter analysis has also provided evidence regarding facts such as the cause of death, the amount of force used against the victim, the number of blows struck, the assailant's infliction of the blows, and the assailant's presence during the attack.

Danny R. Veilleux, J.D., Annotation, *Admissibility, In Criminal Prosecution, Of Expert Opinion Evidence As To "Blood Splatter" Interpretation,* 9 A.L.R. 5th 369, 379 & 381 (1993).

Similarly, in *Farris v. State,* 670 P.2d 995, 997 (Okla.Crim.App.1983), cited with approval in *State v. Rodgers,* 119 Idaho 1047, 812 P.2d 1208, 1210 (1991), the Oklahoma Court of Criminal Appeals stated:

[G]eometric Blood Stain Interpretation is a method used to reconstruct the scene of the crime. Blood stains are uniform in character and conform to the laws of inertia, centrifugal force and physics. Study of the blood pattern along with its size and shape helps determine the source of the blood and any movement that might have occurred after the bloodshed began, including subsequent violent attacks upon the victim.

Finally, in *State v. Moore,* 458 N.W.2d 90, 97 (Minn.1990), the Minnesota Supreme Court quoted from a portion of the expert witness's testimony explaining the blood splatter interpretation technique:

During bloodsplattering interpretation we look at the actual droplets of blood that have been shed on a crime scene. Blood has characteristics that abide by the law of physics when blood is shed, whether it is from a stabbing, bludgeon or gunshot wound. When a drop of blood is shed it undergoes certain patterns. If it is dropped straight up and down and lands on a surface, it will leave a perfectly round pattern. As the angle increases the blood splatter or droplets of blood as they strike something will become longer or narrower. There is a mathematical correlation between the length and the width of these blood splatters that can be measured. We can then determine what angle they came in at and by using a set of strings and thumbtacks and large protractor we are able to reconstruct the scenes of crimes many times and actually place people where they were at the time they were injured . . . or shot.

Consistent with Sgt. Pippins' testimony, numerous cases hold that by identifying "medium-velocity," "high-velocity," or "impact" blood spatters, expert analysts may determine that given blood patterns resulted from the victim being struck with a particular amount of force, consistent with a beating, stabbing, or shooting. *See "Blood Splatter" Evidence,* 9 A.L.R. 5th at 387 n. 23. In addition to providing proof of the defendant's proximity to the victim at the time blood was shed, expert testimony concerning blood spatter patterns on the defendant's clothing may help the prosecution establish the defendant's participation in the attack. *"Blood Splatter" Evidence,* 9 A.L.R. 5th at n. 24–26.

Bloodstain pattern analysis is not a novel scientific technique; rather, it is a narrower application of techniques borrowed from the established fields of chemistry, physics, mathematics, and biology. *Lewis v. State,* 737 S.W.2d 857, 860 (Tex.App.—Houston [1st Dist.] 1987, pet. ref'd). *See State v. Proctor,* 94 Or.App. 720, 723, 767 P.2d 453, 455 (1989)(observing that only the method by which the blood spatter was collected is novel, all other aspects of the pathologist's investigation are well known in the field of blood spatter analysis). It is a forensic science recognized by the Federal Bureau of Investigation, New Scotland Yard, and other law enforcement agencies throughout the United States. *See Farris,* 670 P.2d at 996. Most states, including Texas, consider this type of expert testimony as having an inherent understandability. *See Rodgers,* 812 P.2d at 1211; *Lewis,* 737 S.W.2d at 860; *State v. Hall,* 297 N.W.2d 80, 86 (Iowa 1980), *cert. denied,* 450 U.S. 927, 101 S.Ct. 1384, 67

L.Ed.2d 359 (1981); *Robinson v. State,* 574 So.2d 910, 918–19 (Ala.Crim.App.1990); *People v. Clark,* 5 Cal.4th 950, 22 Cal. Rptr.2d 689, 857 P.2d 1099 (1993). Further, and contrary to the majority's conclusion, bloodstain pattern analysis does not carry a misleading aura of scientific infallibility. *See People v. Samayoa,* 15 Cal.4th 795, 64 Cal.Rptr.2d 400, 938 P.2d 2, 38 (1997); *Clark,* 22 Cal.Rptr.2d 689, 857 P.2d at 1142. My review of the available case authority, literature, and other relevant materials reveals that there are recognized authorities in bloodstain pattern analysis as well as numerous publications on the subject. *See e.g.,* VIRGIL THOMAS BEVEL AND ROSS M. GARDNER, Bloodstain Pattern Analysis: With an Introduction to Crime Scene Reconstruction (1997); WILLIAM G. ECKERT AND STUART H. JAMES, Interpretation of Bloodstain Evidence at Crime Scenes (Elsevier Series in Practical Aspects of Forensic and Criminal Investigations) (1989); HERBERT LEON MACDONNELL, Bloodstain Pattern Interpretation, (Laboratory of Forensic Science, Corning, NY: 1993); HERBERT LEON MACDONNELL, Flight Characteristics and Stain Patterns of Human Blood, (DOJ, Washington, D.C.: 1971).[5] The authors of these books have testified as experts in bloodstain pattern analysis not only before Texas courts but courts throughout the United States on numerous occasions. *See e.g., Mosley v. State,* 983 S.W.2d 249, 254 (Tex.Crim.App. 1998); *Ex parte Mowbray,* 943 S.W.2d 461, 462–65 (Tex.Crim.App.1996); *Horinek v. State,* 977 S.W.2d 696, 702 (Tex.App.— Fort Worth 1998, pet. ref'd); *Lewis,* 737 S.W.2d at 860–61; *Hall,* 297 N.W.2d at 85; *Romano v. State,* 909 P.2d 92, 109–110 (Okla.Crim.App.1995); *Farris,* 670 P.2d at 997–98. Moreover, the field is taught through seminars and courses throughout North America, such as those attended by Sgt. Pippins. Courts from other jurisdictions considering the merits of bloodstain pattern analysis have found it to be reliable. *See also Hogan v. State,* 877 P.2d 1157 (Okla.Crim.App.1994). All of these facts indicate both that the scientific theories underlying bloodstain pattern analysis and the techniques applying the theory are valid.

### Judicial Notice

Because the techniques involved in the analysis are based on the well-settled sciences of chemistry and physics, the reliability of the technique is an appropriate topic for judicial notice. *See Moore,* 458 N.W.2d at 97 n. 6; *People v. Knox,* 121 Ill.App.3d 579, 76 Ill.Dec. 942, 459 N.Ed.2d 1077, 1080 (1984). Thus, in passing on Appellant's fifth point of error, I believe we should inquire into the reliability of bloodstain pattern analysis pursuant to the doctrine of judicial notice as authorized by *Emerson v. State,* 880 S.W.2d 759, 764 (Tex.Crim.App.1994). *See Ochoa v. State,* 994 S.W.2d 283, 284 n. 10 (Tex.App.—El Paso 1999, no pet.)(acknowledging intermediate appellate court's ability to take judicial notice of scientific fact for purposes of determining reliability under Rule 702).

We are authorized to take judicial notice of any scientific fact which " 'is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *Emerson,* 880 S.W.2d at 764. The concept of judicial notice extends to scientific techniques and principles:

> Once a scientific principle is sufficiently established, a court may take judicial notice of the validity of that principle. Similarly, a court may take judicial notice of the validity of the technique applying that principle. In either case the effect is the same: judicial notice relieves the offering party of the burden of producing evidence on these issues.

*Id.* at 764.

In conducting our inquiry into the reliability of the theory underlying the blood-

---

**5.** Access to many additional publications and articles pertaining to bloodstain pattern anal-

ysis may be found at various sites on the Internet.

stain pattern analysis and the technique, we take judicial notice of both legislative facts and adjudicative facts. *Id.* at 764–65. Legislative facts include the facts stated in scientific articles outside of the record. *Id.* Adjudicative facts, on the other hand, are " 'facts about the particular event which gave rise to the lawsuit and, like all adjudicative facts ... [help] explain who did what, when, where, how, and with what motive and intent.' " *Id.* at 765.

The majority questions whether, as stated by Sgt. Pippins in his testimony, bloodstain pattern analysis can be utilized to "determine the aftermath of a violent incident of bloodshed and to try to determine the location of individuals before, during and after bloodshed and to try to determine, perhaps, a sequence of events that occurred based upon the bloodstain evidence available at the scene." (*Majority Op.*, at 30). It further suggests that such testimony would lead the jury to draw conclusions based more upon speculation than scientific evaluation. When considered in light of the relevant scientific, legislative, and adjudicative facts, none of these observations is valid or supportable.

### Application of the Technique

Since the majority assumes that bloodstain pattern analysis evidence is generally unreliable, it fails to address whether Sgt. Pippins applied the technique correctly on this occasion. The evidence shows that he did. Sgt. Pippins conducted his bloodstain pattern analysis directly at the crime scene where he was able to view the bloodstain patterns and the victim still within the crime scene. In drawing his conclusions, Sgt. Pippins additionally relied on photographs of the victim from the autopsy, Appellant, the victim's vehicle, and the autopsy report. Sgt. Pippins testified extensively from the photographs and explained in detail the basis for his conclusions. Based upon this same testimony, I would further find that the trial court did not abuse its discretion in finding that the

evidence would assist the trier of fact and is sufficiently tied to the facts of the case. *See Jordan*, 928 S.W.2d at 555. With the three *Kelly* reliability factors thus established, I turn now to a consideration of whether, despite its reliability and relevance, the probative value of the evidence was outweighed by some factor identified in Rule 403.

### Rule 403 Analysis

The majority concludes that the bloodstain pattern analysis evidence was unhelpful and therefore inadmissible under TEX.R.CRIM.EVID. 403 because Sgt. Pippins was permitted to testify that there was no evidence that the victim acted as the aggressor during the fatal assault. First, Appellant never made this specific objection in the trial court and he certainly does not raise this issue on appeal. Therefore, it is waived. TEX.R.APP.P. 33.1. Second, this opinion comprised only a portion of Sgt. Pippins' testimony. The bulk of his testimony concerned an explanation of where the assault began, where it traveled, and the relative positions of the bodies during the assault, all of which was based on bloodstain pattern analysis. This portion of his testimony was clearly admissible and within the scope of his field of expertise. Therefore, even assuming that bloodstain pattern analysis does not lend itself to rendering an opinion as to whether one of the parties acted as an aggressor during the assault, that fact would not render Sgt. Pippins' testimony inadmissible in its entirety. Finally, Sgt. Pippins mentioned on several occasions that no *physical* evidence, including the relative positions of the bodies during the assault and the absence of any wounds on Appellant, existed to show that the victim acted as the aggressor. In my view, these are proper inferences which may be drawn by an bloodstain pattern analysis expert. He readily admitted that he could not definitively state that the victim did not grab Appellant first or otherwise act as the aggressor at some point during the as-

sault. Consequently, I would find that the trial court did not abuse its discretion in refusing to exclude the testimony under Rule 403. For all of these reasons, I would overrule Point of Error Five.

### *Harm Analysis*

Having determined that the trial court erred in failing to conduct a *Kelly* hearing outside the presence of the jury, we must conduct a harm analysis. Because this is not constitutional error, we apply Tex. R.App.P. 44.2(b) which requires us to disregard the error and affirm unless harm is affirmatively shown in the record. *Villalobos v. State*, 999 S.W.2d 132, 136 (Tex. App.—El Paso 1999, no pet.); *Merritt v. State*, 982 S.W.2d 634, 636 (Tex.App.— Houston [1st Dist.] 1998, pet. ref'd untimely filed). The effect of this is to place the burden on the defendant to show actual harm. *Villalobos*, 999 S.W.2d at 136.[6]

Even though the court's error of law improperly relieved the State of its burden to show that the evidence was admissible, sufficient evidence was presented to support the admission of the scientific evidence at trial. Thus, the evidence itself was properly before the jury, and the error of law did not affect a substantial right of the accused. *Chisum v. State*, 988 S.W.2d 244, 251 (Tex.App.—Texarkana 1998, pet. ref'd); *Brown v. State*, 881 S.W.2d 582, 588 (Tex.App.—Corpus Christi 1994, no pet.). Because the error is harmless, I would overrule Point of Error Four.

---

6. Although the majority applies the factors found in *Harris v. State*, 790 S.W.2d 568, 584– 88 (Tex.Crim.App.1989), in conducting its harm analysis under Tex R.App.P. 44.2(b), this Court recently abandoned that approach. *See Sanford v. State*, 21 S.W.3d 337 (Tex.App.—El Paso 2000, no pet. h.).